UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAHIR RAMOS, individually and as the Administratrix of the ESTATE OF ANGEL RAMOS,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>THOMAS J. MARCISZ, M.D., et al.,<br><br>　　　　　　　　　　　Defendants. | CASE NO. 06-CV-2282 W (CAB)<br><br>ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT THOMAS J. MARCISZ, M.D. (Doc. No. 70) |

  On May 7, 2007 Plaintiff Nahir Ramos ("Plaintiff" or "Mrs. Ramos") filed a first amended complaint ("FAC") against Defendants Thomas J. Marcisz, M.D. ("Dr. Marcisz") et al. alleging professional negligence, wrongful death, and loss of care, comfort, companionship and support. (Doc. No. 31.) Pending before the Court is Dr. Marcisz's Federal Rule of Civil Procedure 56 motion for summary judgment, which is joined by Defendant Tri-City Medical Center ("Tri-City"). (Doc. Nos. 70, 71.) The Court takes the matter under submission and without oral argument. See S.D. Cal. Civ. R. 7.1(d.1). For the following reasons, the Court **GRANTS** Dr. Marcisz's motion for summary judgment.

///

///

## I. BACKGROUND

Plaintiff Nahir Ramos, a New Jersey resident, was the wife of the late Angel Ramos ("Mr. Ramos") and is the Administratrix of Mr. Ramos' estate. (FAC ¶¶ 1, 2, 53.) Defendant Tri-City is a California healthcare district, organized and existing under California's Local Health Care District Law. (*Id.* ¶ 6.) Tri-City operates a hospital in Oceanside, California, which treats patients and employs numerous physicians, including Dr. Marcisz. (FAC ¶¶ 6, 11, 14.)

On October 7, 2005 Mr. Ramos, traveling in the San Diego area on business, was admitted to Tri-City's emergency room complaining of decreased vision and a severe headache behind his right eye. (*Def.'s Summ. J. Mot.* Ex. 2.) Tri-City's records indicate that Mr. Ramos exhibited slurred speech and was barely conscious. (*Id.*) Soon after arriving, CT imaging of Mr. Ramos discovered a large right acute subdural hematoma. (*Id.*) After Mrs. Ramos gave her informed consent, Tri-City doctors performed an emergency craniotomy and evacuated Mr. Ramos' hematoma. (*Id.*; *Def.'s Summ. J. Mot.* Ex. 3.)

After surgery, Mr. Ramos was left intubated and returned directly to the Intensive Care Unit. (*Def.'s Summ. J. Mot.* Ex. 4.) For the next seven days, Mr. Ramos appeared to make good, steady progress in recovery. (*Id.* Ex. 2.) According to Plaintiff's expert, however, during that time Dr. Marcisz breached his standard of care by not ordering further diagnostic tests (such as a CT angiogram, MRA, or arteriogram) as to the possible cause of the hematoma. (*Lubin Decl.* Ex. C.)

On October 15, 2008 Mr. Ramos took an unfortunate turn for the worse. Although at 4:00 a.m. a nurse described him as "neurologically intact, awake, and alert," by 6:00 a.m. Mr. Ramos was described as comatose with decerebrate posturing. (*Def.'s Summ. J. Mot.* Ex. 2.) Another CT imaging showed a new hematoma. (*Id.*) Mr. Ramos was again rushed into surgery, where doctors performed another emergency craniotomy and evacuated a second hematoma. (*Def.'s Summ. J. Mot.* Exs. 2, 5.)

After the second operation, Mr. Ramos' recovery proceeded much more slowly.

On October 26, 2005 Mr. Ramos was finally extubated. (*Def.'s Summ. J. Mot.* Ex. 2.) On November 9, 2005 Mr. Ramos finally displayed "some opening of the eyes." (*Id.*) He remained semi-comatose, however, and could not follow commands. (*Id.*) On November 17, 2005 Tri-City transferred Mr. Ramos to Monmouth Medical Center in Long Branch, New Jersey. (*Id.*) On November 26, 2005 Mr. Ramos finally succumbed. (*Id.* Ex. 6.)

On October 11, 2006 Mrs. Ramos filed this action alleging professional negligence, wrongful death, failure to obtain informed consent, and loss of care, comfort, companionship and support. (Doc. No. 1.) On August 13, 2008 Dr. Marcisz moved for summary judgment. (Doc. No. 70.) Tri-City filed a notice of joinder the next day. (Doc. No. 1.) On September 8, 2008 Mrs. Ramos opposed Dr. Marcisz's motion. (Doc. No. 77.) On September 15, 2008 Dr. Marcisz filed his reply. (Doc. No. 79.)

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential

to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III. DISCUSSION

Dr. Marcisz argues that the question of his liability for Mr. Ramos' demise turns on the issue of causation: whether Dr. Marcisz's negligence, if any, caused Mr. Ramos' death. (Def.'s Summ. J. Mot. 5.) Specifically, Dr. Marcisz contends that Plaintiff has no evidence that Dr. Marcisz's failure to order further testing caused Mr. Ramos' second hematoma or that ordering the diagnostic tests would have prevented the second bleed leading to Mr. Ramos' eventual demise. (Id.) Plaintiff responds by paraphrasing the

expert testimony of Dr. Gene E. Bolles, who opines that "had an MRA, CTA or anteriogram [sic] been done diagnosing a vascular abnormality as the cause of the bleed, a second bleed could have been prevented." (Pl.'s Opp'n 6.)[1]

Liability for medical malpractice and wrongful death is predicated upon a causal connection between the negligent conduct and the resulting injury. Bromme v. Pavitt, 7 Cal. Rptr. 2d 608, 613 (Cal. Ct. App. 1992); Dumas v. Cooney, 1 Cal. Rptr. 2d 584, 589 (Cal. Ct. App. 1991). The law is well-settled that causation must be proven within a reasonable medical probability based upon competent expert testimony. Bromme, 7 Cal. Rptr. at 614. Mere possibility alone is insufficient to establish a prima facie case. Id. A "possible" cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. Id. This is the outer limit of inference upon which an issue may be submitted to the jury. Id.

It follows that, in order for a plaintiff to show that the death was "caused by" defendant's medical negligence, plaintiff must establish a "reasonable medical probability" that the negligence was sufficient of itself to bring about the death, i.e., the death was "more likely than not" the result of the negligence. Id. (citing Jones v. Ortho Pharm. Corp., 209 Cal. Rptr. 456 (Cal. Ct. App. 1985)). For public policy reasons, California courts have been reluctant to relax this traditional causation requirement. See, e.g., Dumas, 1 Cal. Rptr. at 592 (discussing potential negative implications to doctors and healthcare systems should causation standard be lowered).

Here, Dr. Marcisz deposed Plaintiff's expert, Dr. Bolles, on July 16, 2008, which is about six weeks after Dr. Bolles submitted his supplemental expert report. (Def.'s Summ. J. Mot. Ex. 8.) At his deposition, Dr. Bolles admitted that, even if Dr. Marcisz

---

[1] Plaintiff also briefs several other issues, including Dr. Marcisz's alleged standard of care deviation, Tri-City's nursing staff's alleged standard of care deviation, and Tri-City's liability through Dr. Marcisz's ostensible agency relation. (Pl.'s Opp'n 4–6, 7.) For the purposes of this motion, however, Dr. Marcisz has conceded that questions of fact exist concerning Dr. Marcisz's alleged standard of care deviations. (Def.'s Reply 2.) Accordingly, the only issue Dr. Marcisz moves on and the only issue the Court decides is whether Dr. Marcisz's actions or inactions caused Mr. Ramos' death.

ordered further diagnostic testing, he did not know what, if anything, additional testing would have revealed. (*Id.* at 4:9–20.) Dr. Marcisz also singles out the following line of questioning between Defendant's counsel and Dr. Bolles:

> Q: If a vascular lesion was diagnosed, can you say to a degree of medical probability that the second bleed would have been prevented?
> A: No.
> Q: And if a vascular lesion was not diagnosed, can you say to a degree of medical certainty that a second bleed would not have occurred?
> A: No.

(*Id.* at 5:5–13.)

The information Dr. Marcisz presents compels the Court to conclude that Plaintiff has failed to produce evidence suggesting that Dr. Marcisz's alleged negligence caused Mr. Ramos' death. Even if Dr. Marcisz ordered further diagnostic testing after the first craniotomy, Plaintiff's expert cannot say with any probability what the tests would have shown. (*Def.'s Summ. J. Mot.* Ex. 8 at 4:9–20.) And even if the diagnostic testing indicated some cause for concern,[2] Plaintiff's expert cannot say with any probability whether the second hematoma or Mr. Ramos' death could have been prevented. (*Id.* at 5:5–13.) Furthermore, Dr. Bolles admits that the second bleed could have occurred even if Dr. Marcisz ordered additional testing and found no vascular abnormalities or cause for concern. (*Id.*) In short, Dr. Bolles' testimony is insufficient to establish that Dr. Marcisz's alleged negligence caused a failure to prevent Mr. Ramos' second bleed that resulted in his death—it instead tends to establish that no causal link exists whatsoever.

Plaintiff tries to create an issue of fact by misconstruing Dr. Bolles' original May 13, 2008, expert report and May 30, 2008, supplemental report. (*Pl.'s Opp'n* 6–7.) Selectively reading both reports, Plaintiff takes the position that Mr. Ramos had some sort of detectable vascular abnormality or malformation and that Dr. Marcisz's failure to diagnose the abnormality caused Mr. Ramos' second bleed and ultimate demise.

---

[2] For example, both parties seem to agree that an existing vascular abnormality would be a cause for concern. (*Pl.'s Opp'n* Ex. C at 22.) Doctor Marcisz, however, correctly points out that Plaintiff has no evidence that a detectable vascular abnormality or malformation *caused* Mr. Ramos' second hematoma that led to his eventual demise. (*Def.'s Reply* 3.)

Taken in context, however, Dr. Bolles' reports clearly respond to Plaintiff's counsel's inquiries regarding Dr. Marcisz's responsibilities and omissions under the relevant standard of care. They do not inquire as to whether Dr. Marcisz's actions or inactions actually caused Mr. Ramos' death. Although for the first time in his supplemental report Dr. Bolles opined that "had [further diagnostic testing] been ordered, a malformation would *likely* have been detected…[,]" six weeks later Dr. Bolles admitted that he had no idea what further diagnostic testing might show. (Compare *Pl.'s Opp'n* Ex. E at 28 (emphasis added) with *Def.'s Summ. J. Mot.* Ex. 8 at 4:9–20.) Nowhere does Dr. Bolles or anyone else even state that a malformation or vascular abnormality caused Mr. Ramos' second bleed and death.

Given that Dr. Bolles' reports clearly speak to Dr. Marcisz's standard of care, Plaintiff cannot manufacture an issue of fact by juxtaposing Dr. Bolles' supplemental report's general, non-medical term "likely" against Dr. Bolles' more recent, specific deposition testimony on causation. See Celotex, 477 U.S. at 324 (holding that non-moving party must establish specific facts showing a genuine issue for trial). Because even when viewed in the light most favorable to the non-moving party Plaintiff has no evidence suggesting that it is more likely than not that Dr. Marcisz's breach caused or failed to prevent Mr. Ramos' second bleed and eventual death, the Court **GRANTS** Defendant Dr. Marcisz's motion for summary judgment.[3]

///
///
///
///
///
///

---

[3] Plaintiff also cites evidence that "[h]ad there not been a second bleed,… a full recovery was indeed quite likely[]" (*Pl.'s Opp'n* Ex. C) and "[i]f Mr. Ramos had not suffered a subsequent deterioration in his condition he would probably have made a full or nearly full recovery[]" (*Pl.'s Opp'n* Ex. D). This is common sense and in no way implicates whether Dr. Marcisz's alleged breach of his standard of care caused the second bleed.

## IV. CONCLUSION

The Court sympathizes with the family, friends, professionals, and parties affected by the loss of Mr. Ramos. Unfortunately for Plaintiff, however, there is no evidence suggesting that Dr. Marcisz's actions or inactions were more likely than not the cause of Mr. Ramos' second bleed and eventual death. For the aforementioned reasons, the Court **GRANTS** Defendant Dr. Marcisz's motion for summary judgment.

IT IS SO ORDERED.

DATE: September 24, 2008

HON. THOMAS J. WHELAN
United States District Court
Southern District of California